**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT CINCINNATI**

| | | |
|---|---|---|
| AMATECH GROUP LIMITED, | : | |
| | : | |
| Plaintiff, | : | No. 21-406 |
| | : | |
| v. | : | Judge _____ |
| | : | |
| FEDERAL CARD SERVICES, LLC, | : | **COMPLAINT FOR DAMAGES AND** |
| DAVID FINN, DARREN MOLLOY, and | : | **INJUNCTIVE RELIEF** |
| GERALD LINDEN | : | |
| | : | **JURY TRIAL DEMANDED** |
| Defendants. | : | |
| | : | |

Plaintiff AmaTech Group Limited ("AmaTech") states as follows for its Complaint against

Defendants Federal Card Services, LLC ("FCS"), David Finn, Darren Molloy, and Gerald Linden

(collectively, "Defendants"):

## INTRODUCTION

1.       Plaintiff AmaTech, a subsidiary of Paragon ID, is a pioneer in the development of

contactless technology in EMV® metal smartcards.  AmaTech, through its innovative designs,

manufacturing processes, and other patented and proprietary technology, provides contactless

metal card solutions, including luxury metal smartcards with a prestigious look and feel.

AmaTech brings this action to stop the unlawful misappropriation of its trade secrets, which has

caused, and continues to cause, AmaTech irreparable harm.

2.       Defendant David Finn was the Chief Executive Officer and main shareholder of

AmaTech prior to its acquisition by Paragon ID.  After the acquisition, Mr. Finn stayed on in a

consulting role, before leaving to work for Defendant FCS, a competitor of AmaTech and

Paragon ID based in Cincinnati, Ohio, in July 2019.  Following his departure from AmaTech,

Mr. Finn—working on FCS' behalf and, on information and belief, with FCS' full knowledge

1

and support—induced Defendant Darren Molloy, an AmaTech employee (now an ex-employee), to share certain confidential trade secret information belonging to AmaTech. This misappropriated AmaTech information concerns metal card components and, more specifically, certain adhesive systems, coupling antennas, and dual-interface chip modules developed by AmaTech. Mr. Finn and FCS have used AmaTech's misappropriated trade secret information in their own patent filings, which recently became public, destroying the confidential nature of that information and diminishing its commercial value.

3. On information and belief, FCS and Mr. Finn knew that the information that Mr. Molloy was providing to them was confidential to AmaTech, and that, by providing this information, Mr. Molloy was violating the terms of his employment agreement with AmaTech. On information and belief, Mr. Molloy was aware of this as well. FCS', Mr. Finn's, and Mr. Molloy's misappropriation of AmaTech's confidential trade secrets has caused, and is causing, AmaTech substantial and irreparable harm.

4. FCS' and Mr. Finn's patent applications containing AmaTech's misappropriated confidential information were prepared and filed by Defendant Gerald Linden. On information and belief, FCS and/or Mr. Finn engaged the services of Mr. Linden shortly after Mr. Finn left AmaTech for FCS in July 2019. Crucially, at all relevant times, Mr. Linden was also acting as AmaTech's patent attorney. Mr. Linden had a longstanding professional relationship with AmaTech dating back to 2006 and represented AmaTech in many patent matters before the United States Patent and Trademark Office (the "USPTO"). Mr. Linden's concurrent representation of FCS and Mr. Finn was in clear breach of his obligations to AmaTech, as Mr. Linden, FCS, and Mr. Finn all knew and/or should have known.

2

5. In particular, Mr. Linden's preparation and filing of patent applications on FCS' and Mr. Finn's behalf created a clear conflict of interest on his part. For example, some of those applications contained AmaTech's confidential trade secret information—something that Mr. Linden knew and/or should have known but never advised AmaTech about. As another example, some of the applications that Mr. Linden filed for FCS and/or Mr. Finn went out of their way to disparage AmaTech's prior applications, which Mr. Linden had also prepared, filed, and prosecuted. As yet another example, some of the applications that Mr. Linden filed for FCS and/or Mr. Finn presented claims directed to the same subject matter, or obvious variations thereof, as that taught in AmaTech's prior applications, which Mr. Linden had also prepared, filed, and prosecuted.

6. Mr. Linden never informed AmaTech of his conflict of interest.

7. What is even more troubling, AmaTech recently learned that Mr. Linden was not even a duly licensed attorney during at least some of the time when he purported to act as AmaTech's patent counsel. Indeed, on information and belief, Mr. Linden retired from the practice of law as far back as 2006. Despite this, Mr. Linden held himself out to be a duly licensed attorney throughout all of his dealings with AmaTech. In doing so, he fraudulently induced AmaTech into contracting with him for his professional services and paying him significant sums of money in legal fees.

8. AmaTech now brings claims against FCS, Mr. Finn, and Mr. Molloy individually for trade secret misappropriation. Further, AmaTech brings a claim against FCS, Mr. Finn, and Mr. Molloy for conspiracy to misappropriate trade secrets. Further, AmaTech brings claims against FCS and Mr. Finn for their tortious interference with AmaTech's contracts with Mr.

Molloy and, separately, Mr. Linden.  Further, AmaTech brings claims against Mr. Linden for breach of contract, breach of fiduciary duty, and fraud.

## THE PARTIES

9.      Plaintiff AmaTech is an Irish corporation with a place of business in Galway, Ireland.

10.     On information and belief, Defendant FCS is an Ohio limited liability company with a place of business in Cincinnati, Ohio.

11.     On information and belief, Defendant David Finn is an individual residing in Füssen Weissensee, Germany.  Mr. Finn is the Chief Technology Officer, and on the senior management team, of FCS.

12.     On information and belief, Defendant Darren Molloy is an individual, who is a citizen of Ireland residing in Galway, Ireland.  On information and belief, Mr. Molloy is an employee of defendant FCS and/or its subsidiaries.

13.     On information and belief, Gerald Linden is an individual, who is a citizen of the United States operating in the State of Florida.

## JURISDICTION AND VENUE

14.     This action arises under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*  This action also arises under the Ohio Uniform Trade Secrets Act, OCR § 1333.61, *et seq.*  This action also arises under state common law.

15.     This Court has subject matter jurisdiction over the DTSA claims asserted in this Complaint under 28 U.S.C. § 1331 because those claims arise under federal law.  Further, this Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the state law claims because they are so closely related to AmaTech's claim for misappropriation of trade secrets under the DTSA as to form part of the same case or controversy.

4

16. This Court has personal jurisdiction over FCS because FCS has had continuous and systematic contacts with the State of Ohio and this District. FCS is a limited liability company organized and existing under the laws of Ohio and having its principal place in this District.

17. Further, this Court has personal jurisdiction over Mr. Finn because Mr. Finn has purposefully directed activities at residents of the State of Ohio and this District, and this action arises out of and relates to those activities. For example, on information and belief, Mr. Finn has committed, and/or is continuing to commit, substantial acts of misappropriation in this District by disclosing AmaTech's confidential trade secret information to FCS, which resides in this District. Mr. Finn is the Chief Technology Officer, and on the senior management team, of FCS.

18. Further, this Court has personal jurisdiction over Mr. Molloy because Mr. Molloy has purposefully directed activities at residents of the State of Ohio and this District, and this action arises out of and relates to those activities. For example, on information and belief, Mr. Molloy has committed, and/or is continuing to commit, substantial acts of misappropriation in this District by disclosing AmaTech's confidential trade secret information to FCS, which resides in this District. On information and belief, for at least some of the relevant time periods, Mr. Molloy was an employee of FCS and/or its subsidiaries.

19. Further, this Court has personal jurisdiction over Mr. Linden because Mr. Linden has purposefully directed activities at residents of the State of Ohio and this District, and this action arises out of and relates to those activities. For example, on information and belief, Mr. Linden has purposefully entered into a contract with FCS to provide FCS with legal services and representation, knowing FCS to be a resident of this District. On information and belief, in the course of his representation of FCS, Mr. Linden has made a number of purposeful contacts with

the State of Ohio and this District, including communicating with FCS by mail, email, and/or telephone; negotiating the terms of his representation; advising FCS about the status and progress of FCS' patent filings before the USPTO; requesting and receiving authorization from FCS for various actions; demanding and receiving payment from FCS; and instructing the USPTO to deliver correspondence concerning FCS' patent filings to an address in the State of Ohio, care of D.A. Stauffer Patent Services LLC, a provider of legal services with offices in Cleveland, Ohio. AmaTech's claims against Mr. Linden arise, in whole or in part, from his representation of FCS, a resident of this District, which he undertook concurrently with his representation of, and in breach of his obligations to, AmaTech.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because (i) a substantial part of the events giving rise to AmaTech's claims has occurred, and/or is continuing to occur, in this District; (ii) Defendant FCS resides in this District; (iii) Mr. Finn and Mr. Molloy are foreign individuals not resident in the United States who can be sued in any judicial district; and/or (iv) there is no district in which this action may otherwise be brought as provided in 28 U.S.C. § 1391 and all Defendants are subject to this Court's personal jurisdiction with respect to such action.

## FACTUAL BACKGROUND

### A. Paragon ID's Acquisition of AmaTech

21. Mr. Finn was the Chief Executive Officer and primary shareholder of AmaTech from 2005 until June 2018, when AmaTech was acquired by Paragon ID.

22. Paragon ID is a global leader in identification solutions in the e-ID, transport, smart cities, traceability, and brand protection sectors. Using the latest technologies such as RFID and NFC, Paragon ID provides smart cards, tickets, labels, and tags to worldwide clients in diverse markets including public transport, manufacturing, logistics, gaming, and retail. With its

6

acquisition of AmaTech in June 2018, Paragon ID also entered the banking and payment card sector. Since then, Paragon ID has continued to make significant investments in this sector. For example, in November 2019, Paragon ID acquired Thames Technology, one of Europe's largest card manufacturers, with a view towards manufacturing its own metal cards.

23. AmaTech was in severe financial distress at the time that it was acquired by Paragon ID.

24. For Paragon ID, the value of AmaTech resided in its intellectual property assets, including its patent portfolio and proprietary know-how relating to dual-interface plastic and metal smartcard technology. A dual interface card is a credit or debit card with an embedded chip that allows the card to be used in both contact and contactless transactions.

25. Prior to the acquisition, AmaTech had obtained a number of patents related specifically to metal smartcard technology. The inventors listed on those patents included Mr. Finn and two other key AmaTech employees: Mustafa Lotya and Darren Molloy.

26. After AmaTech was acquired by Paragon ID, Mr. Finn stayed on in a consulting role. His responsibilities included post-acquisition support, research and development, and general leadership of the AmaTech team. Mr. Lotya handled the day-to-day operations, with Mr. Molloy undertaking testing and product development under his direction.

**B. Finn's Departure From AmaTech for FCS**

27. In late 2018, AmaTech began commercial discussions with FCS, a manufacturer of metal payment cards located in Cincinnati, Ohio. The parties discussed the possibility of entering into a supply agreement pursuant to which AmaTech would supply FCS with certain metal card components. The discussions continued into 2019.

28.     Mr. Finn was involved in the discussions with FCS from the beginning and, on information and belief, formed a relationship with FCS management.

29.     AmaTech and FCS completed the negotiations and signed a contract on July 15, 2019 (the "Patent License and Supply Agreement").

30.     Under the Patent License and Supply Agreement, AmaTech would supply FCS with metal card components, such as metal inlays and dual-interface chip modules, to be used by FCS in the manufacture of metal cards.  The Patent License and Supply Agreement also included a technology license from AmaTech to FCS, where AmaTech agreed to license some of its patents relating to "RFID slit" smartcard technology to FCS.  The Patent License and Supply Agreement did not include a transfer of know-how from AmaTech or FCS outside the scope of products to be supplied to FCS under the agreement.

31.     On July 3, 2019, shortly before AmaTech and FCS executed their agreement, Mr. Finn announced his intention to resign from his consultancy position.  His last day with AmaTech was July 24, 2019.  Following his departure, Mr. Finn was not to be privy to any confidential information or research and development activity that was being carried out at AmaTech.

32.     After Mr. Finn left AmaTech, he began working on FCS' behalf to facilitate the supply of metal inlays and dual-interface chip modules from AmaTech to FCS, to be used by FCS in metal cards manufactured under the Patent License and Supply Agreement.  FCS' website currently identifies Mr. Finn as the company's Chief Technology Officer:

8



*See* https://www.fcsmetalcard.com/.

33.     FCS was acquired by HIT Worldwide ("HIT") sometime in 2019.  According to

its website, HIT is "a global company providing technological solutions to an ever growing

financial services market."  HIT's website identifies FCS as its "official manufacturer":



*See* http://www.hit-worldwide.com/.

34.     Mr. Finn's LinkedIn profile states that he is the Chief Technology Officer at HIT:



*See* https://www.linkedin.com/in/david-finn-a1938113/?originalSubdomain=ie.

35.     Mr. Finn also formed a company called "Avenir." On information and belief, Avenir's other directors include FCS' Chairman Matias Gaiza Eurnekian. HIT's website identifies Avenir as HIT's "R&D center in Ireland":



*See* http://www.hit-worldwide.com/.

36.     FCS' relationship with AmaTech has enabled FCS/HIT to build a partnership with smartcard manufacturer Giesecke+Devrient ("G+D"). In October 2019, G+D and HIT formally announced their "strategic partnership." The press release stated that the companies would "combine patented technology and global manufacturing excellence to produce metal cards from HIT's manufacturing facility in Ohio (USA)." *See* https://www.gi-de.com/en/group/press/press-releases/detail/press-detail/g-d-mobile-security-and-hit-form-a-global-partnership-for-payment-cards-in-the-premium-segment.

### C.     **FCS' and Finn's Interference With AmaTech's Business**

37.     Almost immediately after he left AmaTech, Mr. Finn, now working for FCS, began interfering with AmaTech's business.

10

*FCS' and Finn's Relationship With AmaTech Employee Molloy*

38.     AmaTech's management became aware in January 2020 that, unbeknownst to it, AmaTech employee Mr. Molloy had been secretly working with Mr. Finn since Mr. Finn's departure from AmaTech in July 2019.

39.     AmaTech learned that Mr. Molloy had bragged to other AmaTech employees about doing projects for Mr. Finn and receiving money from him.

40.     AmaTech also learned that, without permission, Mr. Molloy had used AmaTech equipment to perform sample testing at Mr. Finn's request and deliberately concealed this work from his supervisors.

41.     AmaTech also learned that, at Mr. Finn's request, Mr. Molloy had traveled to an ACSYS Lasertechnik GMBH ("ACSYS") facility in Mittweida, Germany in December 2019 where, falsely identifying himself as Mr. Finn, he carried out factory acceptance testing ("FAT") on manufacturing equipment ordered by FCS.  The proprietary FAT protocol carried out by Mr. Molloy had been developed by AmaTech for use on AmaTech equipment.  Mr. Molloy also advised FCS on how to set up the equipment after it was delivered to FCS' facility and offered troubleshooting advice based on AmaTech's experience with similar equipment.

42.     Mr. Molloy's employment agreement with AmaTech contained a "Confidentiality" provision that prevented Mr. Molloy from divulging any AmaTech confidential information to anyone outside AmaTech:

11

20.  CONFIDENTIALITY

(a)  You will not, except as authorised or required by your duties, reveal to any person, persons or company any confidential information including without limitation any trade secrets, business plans, secret or confidential operations, processes or dealing or any information concerning the organisation, business, finances, transactions or affairs of the Company, its subsidiary or associated companies or their existing or potential customers which may come to your knowledge during the period of your employment with the Company and you will keep with complete secrecy all such and other confidential information entrusted to you and will not use or attempt to use any such information in any manner which may injure or cause loss either directly or indirectly to the Company or any of its subsidiary or associated companies or their existing or potential customers or its or their business or businesses or may be likely so to do. This restriction will continue to apply after the termination of your employment without limit in point of time but will cease to apply to information or knowledge which may reasonably be said to have come into the public domain other than by reason of breach of the provisions of this Statement.

(b)  You will not during the term of your employment with the Company make otherwise than for the benefit of the Company any notes, memoranda or electronically stored information relating to any matter within the scope of the business of the Company, its subsidiary or associated companies or their existing or potential customers or concerning any of the dealings or affairs of any such company nor will you either during the term of your employment with the Company or afterwards use or permit to be used any such notes or memoranda or information otherwise than for the benefit of the Company, it being the intention of the parties hereto that all such notes, memoranda or information made or stored by you will be the property of the Company and left at its offices upon the termination of your employment with the Company.

A copy of Mr. Molloy's employment agreement is attached as Ex. 1 hereto.

43.    On information and belief, Mr. Finn was aware of the confidentiality restrictions

in Mr. Molloy's employment agreement.

44.    AmaTech conducted a disciplinary hearing for Mr. Molloy on February 12, 2020.

45.    At the disciplinary hearing, Mr. Molloy made a number of false statements. For

example, he repeatedly denied visiting the ACSYS facility to perform the FAT on FCS

equipment. However, weeks after the hearing, he changed his story and admitted, in a letter sent

to AmaTech by his attorneys, that he "did perform the 'FAT' on 3rd December and 4th

December 2019 in Germany."

12

46.     At the disciplinary hearing, Mr. Molloy also stated that he had been pressured by Mr. Finn into performing side projects for him.

47.     Mr. Molloy also stated that Mr. Finn had tried on numerous occasions to obtain information from him about AmaTech's confidential research and development work.

48.     Mr. Molloy also stated that Mr. Finn had invited him to travel to the FCS facility and meet with the FCS management team.

49.     At the conclusion of the disciplinary hearing on February 12, 2020, Mr. Molloy was informed by AmaTech management that he would be suspended pending the conclusion of the investigation into his relationship with Mr. Finn.

50.     On February 25, 2020, Mr. Molloy was invited to a disciplinary meeting. Mr. Molloy declined to attend and resigned from AmaTech with immediate effect on February 26, 2020.

*FCS' and Finn's Relationship with AmaTech Patent Attorney Linden*

51.     At the time of its acquisition by Paragon ID, Gerald Linden was acting as AmaTech's patent attorney.

52.     Mr. Linden had acted as AmaTech's patent attorney since 2006.

53.     Over the course of his engagement with AmaTech, Mr. Linden filed and prosecuted over 90 patent applications for AmaTech.

54.     Mr. Linden signed his most recent engagement letter with AmaTech on August 12, 2019.

55.     In this engagement letter, Mr. Linden expressly represented that "he ha[d] no conflicts of interest with other clients of his":

13



**2. LEGAL SERVICES TO BE PROVIDED.** The legal services to be provided by Attorney to Client are as follows:

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮*
- preparing, filing* and prosecuting US patent applications;
- consulting with Ulrike Cremer regarding non-US patent applications;
- consulting with Client concerning patent strategy;
- consulting with Client regarding licensing relating to the patents.
These services may be referenced in the attached "FEE SCHEDULE"
* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Attorney Linden represents that he has no conflicts of interest with other clients of his.

A copy of Mr. Linden's August 12, 2019 engagement letter with AmaTech is attached as Ex. 2 hereto.

56.    On August 12, 2019, the same day as when he signed his engagement letter with AmaTech, Mr. Linden filed a provisional patent application with USPTO for Mr. Finn. Like many of the patent applications that Mr. Linden had filed on AmaTech's behalf, this Provisional Patent Application No. 62/885,327, entitled "Metal Inlays to Produce Dual Interface Metal Core Smartcards," concerned dual-interface metal smartcard technology.

57.    Over the course of the next year, Mr. Linden would file more than fifty provisional and non-provisional patent applications for Mr. Finn and/or FCS, all the while continuing to prosecute patent applications on AmaTech's behalf.

58.    On information and belief, Mr. Finn and/or FCS engaged Mr. Linden to file and prosecute patent applications on their behalf despite being fully aware that Mr. Linden was AmaTech's patent attorney and owed a duty to AmaTech to avoid conflicts with other clients.

14

59.     Furthermore, as set forth more fully below, at least some of the patent applications that Mr. Finn and/or FCS engaged Mr. Linden to file and prosecute contained various AmaTech trade secret information.

### D.     AmaTech's Trade Secrets

60.     AmaTech has developed a number of valuable trade secrets concerning dual-interface metal smartcard technology.

*AmaTech's Proprietary Epoxy-Based Adhesive System*

61.     AmaTech has a number of U.S. patent applications and patents in its portfolio relating to metal smartcards that are formed from two metal layers adhesively attached to each other using an intermediate layer of dielectric film coated on both sides with thermosetting epoxy.

62.     For example, AmaTech's U.S. Patent No. 10,518,518 B2 (the "'518 Patent"), the application for which was filed on May 3, 2018, discloses a "double-sided adhesive layer with a PET [polyethylene terephthalate] core [that] is used to adhesively attach two metal layers with slits and openings for application in a dual interface plastic metal hybrid card." '518 Patent at 35:29-31. "The PET core acts as a dielectric medium, electrically isolating the metal layers from each other." *Id.* at 35:31-32. "Typically, the dielectric medium will be a layer of plastic material and/or a layer of adhesive." *Id.* at 35:32-35. "Adhesive layers which may be any class of suitable adhesive including but not limited to epoxy, thermoset, UV-cured, hot-melt and pressure-sensitive types." *Id.* at 21:58-60.

63.     Following Mr. Finn's departure from AmaTech in July 2019, AmaTech continued its research and development of epoxy-based adhesive systems for use in metal smartcards. This new research and development work was carried out on a confidential basis. AmaTech has not

15

disclosed the discoveries that have resulted from this work publicly and has undertaken reasonable efforts to maintain their secrecy.

64.     Specifically, after Finn's departure, AmaTech initiated development of a new adhesive system with improved "drop acoustic" properties.  The drop acoustics of a metal card are important, because consumers prefer a metal card that retains its metallic acoustic sound when dropped on a hard surface, instead of making a sound like a plastic card.  However, the use of traditional adhesive systems in the production of metal cards detracts from the card acoustic properties, because it muffles the metallic sound when the card is dropped. Through its development efforts, AmaTech discovered that alternative adhesive systems can result in a superior retention of the metal sound.

65.     AmaTech commenced these developments efforts in October 2019, three months after Finn's departure.  As part of these efforts, AmaTech partnered with GTS Flexible Materials Ltd. ("GTS"), a U.K company specializing in the design and manufacture of adhesive systems. Mr. Lotya visited the GTS facility in Wales in October 2019 to kick-start the development of the new adhesive system.

66.     At Mr. Lotya's direction and control, GTS performed product testing through the remainder of 2019 and early 2020.  Breakthroughs on acoustic properties came between mid-December 2019 and early January 2020.  It was discovered that acoustic properties of a metal card are substantially improved by using an adhesive system comprising an adhesive polyethylene naphthalate (PEN) tape.  This adhesive PEN tape is constructed from a 25 µm (micron) PEN film, which functions as the dielectric layer positioned between the two metal layers, and an epoxy-based thermosetting adhesive, which is applied in a 25 µm coating to both sides of the PEN film to attach the two metal layers together.

16

67.     At or around this time, AmaTech also discovered that the use of thermosetting epoxy in conjunction with a PEN dielectric layer has the additional advantage of improving the manufacturability of the product because the epoxy does not melt and become tacky during the milling (cutting) process.

68.     The adhesive PEN tape developed by or for AmaTech was assigned part number DEVT-008-20.  GTS generated this specific part number on January 8, 2020 and created a product datasheet with detailed technical requirements and specifications on January 9, 2020. The part code and datasheet were confidential to AmaTech and not to be disseminated to anyone outside AmaTech or GTS.

69.     On January 22, 2020, GTS provided AmaTech with a single hard copy of the DEVT-008-20 datasheet.  On the same day, GTS also provided AmaTech with eight sample sheets of the DEVT-008-20 material.

*AmaTech's Proprietary Coupling Antenna Design*

70.     AmaTech started working on a concept for a "coupling antenna" during or before August 2019.  AmaTech made the first working prototypes of the coupling antenna structure in August 2019, after Mr. Finn's departure from AmaTech:



17

71.     The pictured coupling antenna structure comprises several elements.  There are two module openings on each side of the card body. The card body has slits extending from the peripheral edges of the card body to each of the two modules openings.  A dual-interface chip module, comprising a module antenna, is disposed in one of two the module openings.  A first antenna coil is configured to be inductively coupled to the module antenna.  A second antenna coil is configured to be inductively coupled to the other, empty module opening.  The two antenna coils are connected to a capacitor.

72.     The combination of the pictured elements confers a significant commercial advantage.  Among other things, it improves card performance, making it easier for a card user engaged in a contactless transaction to interact with an external card reader from various positions of the card.

73.     The combination of the pictured elements is a proprietary AmaTech design. AmaTech has not disclosed it to anyone outside the company and has undertaken reasonable efforts to maintain its secrecy.

### *AmaTech's Proprietary Dual-Interface 6-Pin Module Design*

74.     AmaTech also developed a proprietary dual-interface 6-pin module design.

75.     Below is a drawing from a technical specification, created by AmaTech and dated December 18, 2018, that shows AmaTech's proprietary module design:

18



VIEW3
SCALE 14 : 1

| DRAWN | 18/12/2018 | AmaTech Group Limited | | |
|---|---|---|---|---|
| CHECKED | | TITLE | | |
| AMATECH GROUP | | 6C_▮▮▮▮▮ | | |
| | SIZE A3 | DWG NO ▮▮▮▮▮ | | REV 1 |
| COMPANY CONFIDENTIAL | SCALE | | SHEET 1 OF 4 | |

76. Proprietary design elements include specific tap-off points of the module antenna (highlighted above) for effecting changes in tuning.

77. The technical specification above is clearly labeled "COMPANY CONFIDENTIAL."

78. The dual-interface 6-pin module design is commercially valuable and confidential to AmaTech. The majority of lower-class, plastic cards in circulation use a smaller face plate that utilizes 6-pin modules. However, there are technological obstacles to implementing a 6-pin module design in a dual-interface metal smartcard. AmaTech's design overcomes those obstacles.

79. AmaTech has undertaken reasonable efforts to maintain the secrecy of its dual-interface 6-pin module design.

**AmaTech's Protection of Its Trade Secrets**

80. AmaTech takes seriously the confidential and proprietary nature of its trade secrets.

19

81.     AmaTech requires its employees to sign confidentiality agreements as part of their employment.

82.     AmaTech also trains its employees concerning confidential information and trade secrets, and secures its facilities with cameras, access badges, and similar procedures to protect its information.

83.     Similarly, AmaTech secures its networks and information with passwords, limitations on access, encryption, and software.

84.     When AmaTech must share confidential information with third parties, it protects such disclosures by entering into agreements with those parties to ensure confidentiality is maintained in their possession as well.

### E.     FCS', Finn's, and Molloy's Misappropriation of AmaTech's Trade Secrets

85.     In February 2020, around the time of Mr. Molloy's resignation from AmaTech, Mr. Finn and/or FCS started filing a series of provisional and non-provisional applications with the USPTO, all listing Mr. Finn as the sole inventor and Mr. Linden as the attorney of record, that contained various AmaTech proprietary trade secret information.

*The Misappropriation of AmaTech's Epoxy-Based Adhesive System Technology*

86.     On February 25, 2020, Mr. Finn filed Provisional Patent Application No. 62/981,040 (the "'040 Provisional") with the USPTO, listing himself as the sole inventor.  The '040 Provisional is publicly available on the USPTO's electronic PAIR database.

87.     The '040 Provisional, entitled "Dual Interface Transponder Chip Module With an Electrical Connection to a Coupling Frame," disclosed AmaTech's recent discovery that the use of a PEN carrier film in conjunction with a thermosetting epoxy can improve a metal card's acoustic properties.

20

88.     For example, the '040 Provisional, filed approximately a month after AmaTech made the discovery, included the following disclosure:

Metallic Acoustic Sound of a Metal Face or Hybrid Card

It is an objective of the current invention that the metal card body retains its metallic acoustic sound when tossed on a hard surface, by careful selection of the dielectric between metal layers, the type of metal used in the card construction, and any panel or insert for fitting into the metal card body. A metal card with a dielectric or an adhesive layer between metal layers renders the drop acoustics of the card to sound like plastic rather than metal, because of the dampening effect of the insulating medium between the metal layers.

In the current invention, it is proposed to use different metal layers in the card construction, such as the combination of different metals such as titanium and stainless steel.

The dielectric layer may be constructed from a 25 µm Polyethylene Naphthalate (PEN) film coated on both sides with a 25 µm coating of an epoxy based thermosetting adhesive system.

89.     The detailed description of the dielectric layer positioned between the two metal layers ("a 25 µm Polyethylene Naphthalate (PEN) film coated on both sides with a 25 µm coating of an epoxy based thermosetting adhesive system") is word-for-word identical to the description contained in the confidential DEVT-008-20 datasheet.  On information and belief, Mr. Finn copied the description of the adhesive PEN tape directly from the confidential DEVT-008-20 datasheet.

90.     The '040 Provisional included additional portions directed to the use of a PEN film in combination with a thermosetting epoxy.  For example, the '040 Provisional included the following Figure 6:

21

**FIG. 6**



91.     On April 23, 2020, Mr. Finn filed another provisional application with the

USPTO.  This Provisional Patent Application No. 63/014,142 (the "'142 Provisional"), entitled

"Dual Interface Transponder Chip Module," again listed Mr. Finn as the sole inventor.  The '142

Provisional is publicly available on the USPTO's electronic PAIR database.

92.     Appended to the '142 Provisional was a copy of the confidential DEVT-008-20

datasheet:



93.     On May 29, 2020, Mr. Finn filed another provisional application with the

USPTO.  This Provisional Patent Application No. 63/031,571 (the "'571 Provisional"), entitled

"Metallic Smartcards," again listed Mr. Finn as the sole inventor.  The '571 Provisional is

publicly available on the USPTO's electronic PAIR database.

94.     The '571 Provisional described the use of a "PEN carrier" with a "special

adhesive system" in order to "maintain the metal sound of a metal containing transaction card":

The metal core layer(s) illustrated, for example, in FIG. 4 (02 Apr 2020; FCS011v2; 63004491) may comprise two (or more) metal layers separated by a dielectric or electrically insulating material, medium or layer. Some of the patents referenced in the background section (see "Some Additional References") disclose smartcards with two (or more) metal layers.

To maintain the metal sound of a metal containing transaction card with two metal layers adhesively attached to each other, a PEN carrier may be used with a special adhesive system.

For example, a medium may be constructed from 25 micron Polyethylene Naphthalate (PEN) film coated on both sides with a 25 micron coating of an epoxy based adhesive system which is thermosetting. The adhesive coating is flexible, non-tacky and of low friction.

95.     The detailed description of the medium layer ("a medium . . . constructed from 25 micron Polyethylene Naphthalate (PEN) film coated on both sides with a 25 micron coating of an epoxy based adhesive system which is thermosetting") is nearly word-for-word identical to the description contained in the confidential DEVT-008-20 datasheet.  On information and belief, Mr. Finn copied that description directly from the confidential DEVT-008-20 datasheet.

96.     The '571 Provisional also contained AmaTech's discovery, never publicly disclosed by AmaTech, that, in addition to improving the metal card's metal properties, the use of thermosetting epoxy in combination with PEN film serves to improve the manufacturability of the metal card:

The adhesive system plays an important role in maintaining the drop acoustics of the metal card. A hard setting epoxy on a dielectric carrier layer such as PEN, PET or PC has the advantage that after laminating the metal layers (25-up format) together, the epoxy does not re-melt and become tacky from the heat generation caused by the CNC milling (singulation process) in reducing the 25-up laminated metal inlay to individual card bodies.

97.     On August 14, 2020, FCS filed a non-provisional application with the USPTO, U.S. Patent Application No. 16/993,295 (the "'295 Application"), listing Mr. Finn as the sole inventor and FCS as the applicant.  This non-provisional application, entitled "Metal-Containing

24

Dual Interface Smartcards" and claiming priority to Mr. Finn's '040, '142, and '571 Provisionals, was published as U.S. Patent Application Publication No. 2021/0049431 Al on February 18, 2021.

98.     The '295 Application made use of AmaTech's proprietary confidential information, including AmaTech's discoveries relating to the use of a PEN carrier film in conjunction with a thermosetting epoxy material:



**FIG. 14**

P1 Opening for Module Tape
P2 Opening for Mold Mass

[0162]    According to some embodiments (examples) of the invention, a smartcard (SC) may comprise two metal layers adhesively attached to each other with thermosetting epoxy. The thermosetting epoxy may be applied in B-stage, and converts to C-stage after a lamination process involving temperature and pressure. The two metal layers may be separated by a dielectric carrier layer. The dielectric carrier layer may comprise a PET film, or a PEN film. The thermosetting epoxy may be applied to both (front and rear) sides of the dielectric carrier. At least one of the metal layers may have a slit (S) so that it may function as a coupling frame (CF).

[0374]    The dielectric carrier layer may be constructed from a 25 μm Polyethylene Naphthalate (PEN) film coated on both sides with a 25 μm coating of an epoxy based thermosetting adhesive system.

[0375]    The adhesive system plays an important role in maintaining the drop acoustics of the metal card. A hard setting epoxy on a dielectric carrier layer such as PEN, PET or PC has the advantage that after laminating the metal layers (e.g. 25-up format) together, the epoxy does not re-melt and become tacky from the heat generation caused by the CNC milling (singulation process) in reducing the 25-up laminated metal inlay to individual card bodies.

[0395]    Before laminating metal layers in a card stack-up construction using an adhesive system (double-sided coated dielectric film) to bond the metal layers together, the adhesive system comprises of an uncured thermosetting epoxy resin in which the material softens when heated in the lamination press. The adhesive system before the lamination process is in an intermediate stage (B-stage) in the reaction of the thermosetting epoxy resin. After lamination, the characteristics of the final cured resin in the C-stage exhibits high thermal properties and does not soften under the influence of heat during the CNC milling process.

[0396]    The dielectric layer may be constructed from a 25 μm Polyethylene Naphthalate (PEN) film coated on both sides with a 25 μm coating of an epoxy based thermosetting adhesive system.

99.    The '295 Application includes claims that directly incorporate AmaTech's

proprietary technology. For example, claim 5, which depends from claims 1, 3, and 4, is directed

to "[a] smartcard comprising two metal layers adhesively attached to each other with

thermosetting epoxy," wherein "the two metal layers are separated by a dielectric carrier layer,"

wherein "the dielectric carrier layer comprises a PET or PEN film," wherein "the thermosetting epoxy is applied to both (front and rear) sides of the dielectric carrier."

100.     Upon publication of the '295 Application on February 18, 2021, the '040, '142, and '571 Provisionals also became available to the public through the USPTO's PAIR website. AmaTech learned about the existence of the '295 Application and the '040, '142, and '571 Provisionals shortly thereafter.

101.     After it learned about the existence of the '295 Application and the '040, '142, and '571 Provisionals, AmaTech started an investigation into how its proprietary information had made its way into Mr. Finn's and FCS' patent filings. AmaTech reached out to GTS and was informed that Mr. Finn had contacted GTS to request the datasheet for DEVT-008-20. In his communication with GTS, Mr. Finn implied that he was still affiliated with AmaTech. In addition, he was able to cite the specific DEVT-008-20 part code to GTS, even though this part code had been generated as a direct result of AmaTech's confidential engagement with GTS and had not been disseminated to anyone outside AmaTech or GTS.

102.     On information and belief, Mr. Finn and/or FCS obtained the DEVT-008-20 part code by improper means. On information and belief, Mr. Finn and/or FCS induced Mr. Molloy, who had been suspended from AmaTech approximately two weeks before Mr. Finn filed the '040 Provisional (the first in the series of applications that copied the detailed technical products specifications from the confidential DEVT-008-20 datasheet), to provide Mr. Finn and/or FCS with the DEVT-008-20 part code in violation of his employment agreement with AmaTech.

103.     On information and belief, Mr. Finn and/or FCS also induced Mr. Molloy to provide them with samples of the DEVT-008-20 material in violation of his employment agreement with AmaTech. Of the eight sample sheets of the DEVT-008-20 material provided to

27

AmaTech by GTS on January 22, 2020, two were later determined by AmaTech to be missing. On information and belief, one or more of these samples had been secretly taken by Mr. Molloy and given to Mr. Finn and/or FCS.

104.    On information and belief, Mr. Finn and/or FCS used the improperly acquired part code for DEVT-008-20, as well as Mr. Finn's previous relationship with AmaTech, to contact GTS and improperly acquire the confidential DEVT-008-20 datasheet.

105.    Mr. Finn and FCS then used the improperly acquired technical specifications for DEVT-008-20 in the '040, '142, and '571 Provisionals and the '295 Application.

106.    By thus improperly acquiring AmaTech's proprietary trade secret information and causing it to be disclosed to the public, FCS, Mr. Finn, and Mr. Molloy have diminished the commercial value of that information, resulting in substantial and irreparable harm to AmaTech.

*The Misappropriation of AmaTech's Coupling Antenna Design*

107.    On February 20, 2020, Mr. Finn filed a Provisional Patent Application No. 62/978,826 (the "'826 Provisional") with the USPTO, listing himself as the sole inventor.  The '823 Provisional is publicly available on the USPTO's electronic PAIR database.

108.    The '826 Provisional, entitled "Dual Interface Metal Face Smartcards," disclosed AmaTech's proprietary coupling antenna structure:

28

**FIG. 6**



Metal Card Bodies with a Slit extending to a Module Opening on each side of the Card Body
**FIG 6** is a modification of figures 5a and 5b, having two module openings (608 MO) and
corresponding slits (630). With the distinction that there is a module antenna (MA 612)
overlapping the module opening (608 MO) and inductively coupling with patch antenna one.
Patch antenna two is also inductively coupled to a module opening (608 MO). Patch antenna
one is connected to patch antenna two via a flexible circuit. A capacitor (CP 618) may be used
in the flexible circuit as a frequency tuning component to optimize RF performance. The
flexible circuit containing the two patch antennae allows full functionality of the card across
the full read/write volume.

109. The combination of the elements highlighted above is a direct clone of
AmaTech's confidential coupling antenna design.

110. On March 6, 2020, Mr. Finn filed another provisional application with the
USPTO. This Provisional Patent Application No. 62/986,612 (the "'612 Provisional"), entitled
"Metal-Containing Dual Interface Smartcards," again listed Mr. Finn as the sole inventor. The
'612 Provisional is publicly available on the USPTO's electronic PAIR database.

111. The '612 Provisional contained the following Figure 12:



112.     Figure 12 represents a variation of and, on information and belief, was derived directly from AmaTech's confidential coupling antenna design previously disclosed in Mr. Finn's '826 Provisional.

113.     On August 14, 2020, FCS filed a non-provisional application with the USPTO, U.S. Patent Application No. 16/994,558 (the "'558 Application"), listing Mr. Finn as the sole inventor and FCS as the applicant. This non-provisional application, entitled "Contactless Metal Cards With Fingerprint Sensor and Display" and claiming priority to Mr. Finn's '826 and '612 Provisionals, was published as U.S. Patent Application Publication No. 2021/0049439 Al on February 18, 2021.

114.     The '558 Application included the following figures:



115.    These Figures 6A, 6B, and 6C represent additional variations of and, on information and belief, were derived directly from AmaTech's confidential coupling antenna design previously disclosed in Mr. Finn's '826 Provisional.

116.    Upon publication of the '558 Application on February 18, 2021, the '826 and '612 Provisionals also became available to the public through the USPTO's PAIR website. AmaTech learned about the existence of the '558 Application and the '826 and '612 Provisionals shortly thereafter.

117.    On information and belief, Mr. Finn and/or FCS obtained AmaTech's confidential coupling antenna design by improper means.  On information and belief, Mr. Finn and/or FCS induced Mr. Molloy, who had been suspended from AmaTech approximately a week before Mr. Finn filed the '826 Provisional (the first in the series of applications that copied AmaTech's confidential coupling antenna design), to provide Mr. Finn and/or FCS with information

31

regarding AmaTech's confidential coupling antenna design in violation of his employment agreement with AmaTech.

118.    By improperly acquiring AmaTech's proprietary trade secret information and causing it to be disclosed to the public, FCS, Mr. Finn, and Mr. Molloy have diminished the commercial value of that information, resulting in substantial and irreparable harm to AmaTech.

### *The Misappropriation of AmaTech's Dual Interface 6-Pin Module Design*

119.    On February 1, 2020, Mr. Finn filed a Provisional Patent Application No. 62/969,034 (the "'034 Provisional") with the USPTO, listing himself as the sole inventor. The '034 Provisional is publicly available on the USPTO's electronic PAIR database. The '034 Provisional, entitled "RFID Enabled Metal Transaction Cards," incorporated AmaTech's proprietary dual-interface 6-pin module design.

120.    Figure 1 (on the left) of the '034 Provisional is essentially a mirror image of the AmaTech's proprietary module design (on the right):



121.    On information and belief, Mr. Finn and/or FCS obtained AmaTech's confidential dual-interface 6-pin module design by improper means. On information and belief, Mr. Finn and/or FCS induced Mr. Molloy to provide them with detailed technical specifications for

32

AmaTech's confidential module design in violation of his employment agreement with AmaTech.

122.    By improperly acquiring AmaTech's proprietary trade secret information and causing it to be disclosed to the public, FCS, Mr. Finn, and Mr. Molloy have diminished the commercial value of that information, resulting in substantial and irreparable harm to AmaTech.

### F.    Linden's Breach of His Obligations to AmaTech

123.    In his engagement letter with AmaTech, Mr. Linden expressly represented that he had no conflicts of interest with any of his other clients.

124.    Despite his obligation to AmaTech to avoid conflicts of interest, Mr. Linden has filed more than fifty provisional and non-provisional patent applications for Mr. Finn and/or FCS since signing the engagement letter with AmaTech.  During the time that he was filing and prosecuting patent applications for Mr. Finn and/or FCS, Mr. Linden continued to file and prosecute patent applications for AmaTech relating to similar technology.

125.    Mr. Linden's representation of Mr. Finn and/or FCS has conflicted with his duties to AmaTech, has been directly adverse to AmaTech, and/or has materially limited his representation of AmaTech.

126.    For example, Mr. Linden knew, or should have known, that the epoxy adhesive PEN tape under development at AmaTech constituted AmaTech's confidential trade secret.  Mr. Lotya specifically identified this epoxy adhesive PEN tape as "sensitive IP material" belonging to AmaTech in an email to Mr. Linden dated April 8, 2020.  Despite that, just over two weeks later, Mr. Linden filed the '142 Provisional on Mr. Finn's behalf, to which he appended the confidential DEVT-008-20 datasheet with detailed technical requirements and specifications for AmoTech's epoxy adhesive PEN tape.  Mr. Linden failed to notify AmaTech that Mr. Finn's

33

'142 Provisional incorporated AmaTech's confidential information. On the contrary, he

proceeded with filing additional applications on Mr. Finn's and FCS' behalf, including the '571

Provisional and '295 Application, that continued to incorporate that same confidential

information.

127. As another example of Mr. Linden's conflict of interest, some of the patent

applications that he has prepared and filed on FCS' or Mr. Finn's behalf have disparaged

AmaTech's patent applications and inventions. For example, the '558 Application that Mr.

Linden filed for FCS criticized AmaTech's U.S. Patent Application Publication No.

2020/0034578 (the "'578 Publication") as "vague" and sought to distinguish the purported

invention of the '558 Application on those grounds:

> [0347] In contrast with '578, which is somewhat vague
> about the interaction of the coupler coils and the slits, the
> sense coils (SeC) or the like (SA) of the present invention
> are specifically designed and implemented to perform a
> primary function of harvesting energy, and may not be
> involved with communicating signals between the two mod-
> ules (e.g., fingerprint sensor and transponder chip module),
> the latter function (communicating and coordinating com-
> munication between modules) being implemented and man-
> aged largely (if not entirely) by the Secure Processing
> Module. However, the following may be noted:

Indeed, it was Mr. Linden who had prepared and filed, on AmaTech's behalf, the patent

application that published as the '578 Publication and that he later disparaged in the competing

'558 Application for FCS.

128. As yet another example of Mr. Linden conflict of interest, on April 13, 2021, the

USPTO issued an office action rejecting most of the claims of the '295 Application, which Mr.

Linden has filed on FCS' behalf, as being anticipated or obvious in view of U.S. Patent

Application Publication No. 2018/0339503, which Mr. Linden previously filed on AmaTech's

behalf. In other words, in the course of his concurrent representation of FCS, Mr. Linden has

prepared and filed patent claims on FCS' behalf claiming the same subject matter, or obvious

variations thereof, as that taught in AmaTech's prior patent applications, which he also prepared,

filed, and prosecuted.  Mr. Linden is now faced with the unethical task of arguing for the

patentability of FCS' claims over AmaTech's prior publication.

129.    Mr. Linden never disclosed his conflict of interest to AmaTech.

## G.    Linden's Fraudulent Representation That He Was a Duly Licensed Attorney

130.    Further, AmaTech learned in April 2021 that, although Mr. Linden had

represented himself to be a duly licensed attorney in his dealings with AmaTech, this was false.

131.    Mr. Linden's website states that he is admitted to practice law in two states:

Pennsylvania and Connecticut.

**GERALD E. LINDEN**
U.S. PATENT ATTORNEY
email: gelpatents@yahoo.com
phone: +1.561.983.6292
fax: +1.815.301.3833

EDUCATION:
1979-1982 Franklin Pierce Law Center (Concord, NH), JD degree
1975-1976 Weber State College (Ogden, UT), BS degree Physics
1969-1972 Cornell University (Ithaca, NY), EE studies

BAR ADMISSIONS:
U.S. Patent and Trademark Office (1981)
State of Pennsylvania (1982)
State of Connecticut (1983)

*See* http://www.gelpatents.com/.

132.    However, a search of the attorney database available on the website of the

Disciplinary Board of the Supreme Court of Pennsylvania shows that Mr. Linden has a "retired"

status in Pennsylvania.  *See* Ex. 3.  In response to AmaTech's inquiry, a representative of the

Disciplinary Board advised AmaTech that Mr. Linden voluntarily retired from the practice of

law in Pennsylvania on July 1, 1994.

133.    Similarly, a search of the attorney database available on the Connecticut Judicial Branch website shows that Mr. Linden retired from the practice of law in Connecticut on May 30, 2006.  *See* Ex. 4.

134.    Attorneys with "retired" status are not permitted to practice law in either Pennsylvania or Connecticut.

135.    Mr. Linden's August 12, 2019 engagement letter with AmaTech identifies Florida as his state of residence.  However, a search of the attorney database available on the Florida Bar website does not show Mr. Linden as having ever been admitted to practice law in Florida.

136.    In his dealings with AmaTech, Mr. Linden always represented himself to be a duly licensed attorney.

137.    On information and belief, Mr. Linden was not, in fact, licensed to practice law in any jurisdiction in the U.S. during at least some of the time when he purported to act as AmaTech's attorney.

138.    In April 2021, AmaTech reached out to Mr. Linden and asked him to clarify the status of his attorney license.  To date, Mr. Linden has not responded to AmaTech's inquiry.

## COUNT I
### Misappropriation of Trade Secrets Under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, Against FCS

139.    AmaTech incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

140.    The trade secret information owned by AmaTech and misappropriated by FCS comprises confidential and proprietary product design information related to (i) AmaTech's epoxy-based adhesive system comprising a 25 µm PEN film coated on both sides with a 25 µm coating of an epoxy based thermosetting adhesive; (ii) AmaTech's coupling antenna design; and (iii) AmaTech's dual-interface 6-pin module design.

141.     Each of the trade secrets at issue derives independent economic value by not being known or readily ascertainable by proper means to competitors.

142.     Each of the trade secrets at issue satisfies the definition of "trade secret" under 18 U.S.C. § 1839(3).

143.     Each of the trade secrets at issue is used in the development of, or in connection with, AmaTech's products, including metal card components, all of which are sold and/or are intended to be sold, in interstate and/or foreign commerce.

144.     AmaTech has taken reasonable steps to ensure the confidentiality of its trade secrets such as disclosing such information only to necessary persons, requiring its employees to sign confidentiality agreements as part of their employment, requiring third parties to sign non-disclosure agreements in the course of business, securing its physical facilities, and protecting its networks and digital information with security protocols, passwords, encryption, and software.

145.     On information and belief, FCS knowingly acquired AmaTech's trade secrets by improper means or through a person who had used improper means to acquire it.

146.     FCS has disclosed and used AmaTech's trade secrets without AmaTech's express or implied consent by revealing AmaTech's trade secrets in its own public patent filings, diminishing the commercial value of those trade secrets.

147.     As a direct and proximate result of FCS' misappropriation, AmaTech has suffered substantial damages.

148.     FCS' misappropriation is willful and malicious and thereby entitles AmaTech to an award of exemplary damages.

149.     AmaTech has suffered and will continue to suffer irreparable harm as a result of FCS' misappropriation, if it is left unrestrained.

37

## COUNT II
### Misappropriation of Trade Secrets Under the Defend Trade Secrets Act,
### 18 U.S.C. § 1836 *et seq*., Against Finn

150.    AmaTech incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

151.    The trade secret information owned by AmaTech and misappropriated by Mr. Finn comprises confidential and proprietary product design information related to (i) AmaTech's epoxy-based adhesive system comprising a 25 µm PEN film coated on both sides with a 25 µm coating of an epoxy based thermosetting adhesive; (ii) AmaTech's coupling antenna design; and (iii) AmaTech's dual-interface 6-pin module design.

152.    Each of the trade secrets at issue derives independent economic value by not being known or readily ascertainable by proper means to competitors.

153.    Each of the trade secrets at issue satisfies the definition of "trade secret" under 18 U.S.C. § 1839(3).

154.    Each of the trade secrets at issue is used in the development of, or in connection with, AmaTech's products, including metal card components, all of which are sold and/or are intended to be sold, in interstate and/or foreign commerce.

155.    AmaTech has taken reasonable steps to ensure the confidentiality of its trade secrets such as disclosing such information only to necessary persons, requiring its employees to sign confidentiality agreements as part of their employment, requiring third parties to sign non-disclosure agreements in the course of business, securing its physical facilities, and protecting its networks and digital information with security protocols, passwords, firewalls, encryption, and software.

156.    On information and belief, Mr. Finn knowingly acquired AmaTech's trade secrets by improper means or through a person who had used improper means to acquire it.

157.    Mr. Finn has disclosed and used AmaTech's trade secrets without AmaTech's

express or implied consent by revealing AmaTech's trade secrets in his own public patent filings,

diminishing the commercial value of those trade secrets.

158.    As a direct and proximate result of Mr. Finn's misappropriation, AmaTech has

suffered substantial damages.

159.    Mr. Finn's misappropriation is willful and malicious and thereby entitles

AmaTech to an award of exemplary damages.

160.    AmaTech has suffered and will continue to suffer irreparable harm as a result of

Mr. Finn's misappropriation, if he is left unrestrained.

## COUNT III
### Misappropriation of Trade Secrets Under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*., Against Molloy

161.    AmaTech incorporates the allegations contained in the preceding paragraphs as if

fully set forth herein.

162.    The trade secret information owned by AmaTech and misappropriated by Mr.

Molloy comprises confidential and proprietary product design information related to (i)

AmaTech's epoxy-based adhesive system comprising a 25 µm PEN film coated on both sides

with a 25 µm coating of an epoxy based thermosetting adhesive; (ii) AmaTech's coupling

antenna design; and (iii) AmaTech's dual-interface 6-pin module design.

163.    Each of the trade secrets at issue derives independent economic value by not

being known or readily ascertainable by proper means to competitors.

164.    Each of the trade secrets at issue satisfies the definition of "trade secret" under 18

U.S.C. § 1839(3).

165.    Each of the trade secrets at issue is used in the development of, or in connection with, AmaTech's products, including metal card components, all of which are sold and/or are intended to be sold, in interstate and/or foreign commerce.

166.    AmaTech has taken reasonable steps to ensure the confidentiality of its trade secrets such as disclosing such information only to necessary persons, requiring its employees to sign confidentiality agreements as part of their employment, requiring third parties to sign non-disclosure agreements in the course of business, securing its physical facilities, and protecting its networks and digital information with security protocols, passwords, firewalls, encryption, and software.

167.    On information and belief, Mr. Molloy knowingly disclosed AmaTech's trade secrets to FCS and/or Mr. Finn without AmaTech's express or implied consent and in violation of his confidentiality obligations to AmaTech, diminishing the commercial value of those trade secrets.

168.    As a direct and proximate result of Mr. Molloy's misappropriation, AmaTech has suffered substantial damages.

169.    Mr. Molloy's misappropriation is willful and malicious and thereby entitles AmaTech to an award of exemplary damages.

170.    AmaTech has suffered and will continue to suffer irreparable harm as a result of Mr. Molloy's misappropriation, if he is left unrestrained.

### COUNT IV
### Misappropriation of Trade Secrets Under the Ohio Uniform Trade Secrets Act, OCR § 1333.61 *et seq*., against FCS

171.    AmaTech incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

40

172.    The trade secret information owned by AmaTech and misappropriated by FCS comprises confidential and proprietary product design information related to (i) AmaTech's epoxy-based adhesive system comprising a 25 µm PEN film coated on both sides with a 25 µm coating of an epoxy based thermosetting adhesive; (ii) AmaTech's coupling antenna design; and (iii) AmaTech's dual-interface 6-pin module design.

173.    Each of the trade secrets at issue derives independent economic value by not being known or readily ascertainable by proper means to competitors.

174.    Each of the trade secrets at issue satisfies the definition of "trade secret" under OCR § 1333.61(D).

175.    AmaTech has taken reasonable steps to ensure the confidentiality of its trade secrets such as disclosing such information only to necessary persons, requiring its employees to sign confidentiality agreements as part of their employment, requiring third parties to sign non-disclosure agreements in the course of business, securing its physical facilities, and protecting its networks and digital information with security protocols, passwords, firewalls, encryption, and software.

176.    On information and belief, FCS knowingly acquired AmaTech's trade secrets by improper means or through a person who had used improper means to acquire it.

177.    FCS has disclosed and used AmaTech's trade secrets without AmaTech's express or implied consent by revealing AmaTech's trade secrets in its own public patent filings, diminishing the commercial value of those trade secrets.

178.    As a direct and proximate result of FCS' misappropriation, AmaTech has suffered substantial damages.

179.     FCS' misappropriation is willful and malicious and thereby entitles AmaTech to an award of exemplary damages.

180.     AmaTech has suffered and will continue to suffer irreparable harm as a result of FCS' misappropriation, if it is left unrestrained.

**COUNT V**
**Misappropriation of Trade Secrets Under the Ohio Uniform Trade Secrets Act,
OCR § 1333.61 *et seq*., Against Finn**

181.     AmaTech incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

182.     The trade secret information owned by AmaTech and misappropriated by Mr. Finn comprises confidential and proprietary product design information related to (i) AmaTech's epoxy-based adhesive system comprising a 25 µm PEN film coated on both sides with a 25 µm coating of an epoxy based thermosetting adhesive; (ii) AmaTech's coupling antenna design; and (iii) AmaTech's dual-interface 6-pin module design.

183.     Each of the trade secrets at issue derives independent economic value by not being known or readily ascertainable by proper means to competitors.

184.     Each of the trade secrets at issue satisfies the definition of "trade secret" under OCR § 1333.61(D).

185.     Each of the trade secrets at issue is used in the development of or in connection with AmaTech's products, including metal card components, all of which are sold and/or are intended to be sold, in interstate and/or foreign commerce.

186.     AmaTech has taken reasonable steps to ensure the confidentiality of its trade secrets such as disclosing such information only to necessary persons, requiring its employees to sign confidentiality agreements as part of their employment, requiring third parties to sign non-disclosure agreements in the course of business, securing its physical facilities, and protecting its

42

networks and digital information with security protocols, passwords, firewalls, encryption, and software.

187. On information and belief, Mr. Finn knowingly acquired AmaTech's trade secrets by improper means or through a person who had used improper means to acquire it.

188. Mr. Finn has disclosed and used AmaTech's trade secrets without AmaTech's express or implied consent by revealing AmaTech's trade secrets in his own public patent filings, diminishing the commercial value of those trade secrets.

189. As a direct and proximate result of Mr. Finn's misappropriation, AmaTech has suffered substantial damages.

190. Mr. Finn's misappropriation is willful and malicious and thereby entitles AmaTech to an award of exemplary damages.

191. AmaTech has suffered and will continue to suffer irreparable harm as a result of Mr. Finn's misappropriation, if he is left unrestrained.

### COUNT VI
### Misappropriation of Trade Secrets Under the Ohio Uniform Trade Secrets Act, OCR § 1333.61 *et seq*., Against Molloy

192. AmaTech incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

193. The trade secret information owned by AmaTech and misappropriated by Mr. Molloy comprises confidential and proprietary product design information related to (i) AmaTech's epoxy-based adhesive system comprising a 25 µm PEN film coated on both sides with a 25 µm coating of an epoxy based thermosetting adhesive; (ii) AmaTech's coupling antenna design; and (iii) AmaTech's dual-interface 6-pin module design.

194. Each of the trade secrets at issue derives independent economic value by not being known or readily ascertainable by proper means to competitors.

195. Each of the trade secrets at issue satisfies the definition of "trade secret" under OCR § 1333.61(D).

196. AmaTech has taken reasonable steps to ensure the confidentiality of its trade secrets such as disclosing such information only to necessary persons, requiring its employees to sign confidentiality agreements as part of their employment, requiring third parties to sign non-disclosure agreements in the course of business, securing its physical facilities, and protecting its networks and digital information with security protocols, passwords, encryption, and software.

197. On information and belief, Mr. Molloy knowingly disclosed AmaTech's trade secrets to FCS and/or Mr. Finn without AmaTech's express or implied consent and in violation of his confidentiality obligations to AmaTech, diminishing the commercial value of those trade secrets.

198. As a direct and proximate result of Mr. Molloy's misappropriation, AmaTech has suffered substantial damages.

199. Mr. Molloy's misappropriation is willful and malicious and thereby entitles AmaTech to an award of exemplary damages.

200. AmaTech has suffered and will continue to suffer irreparable harm as a result of Mr. Molloy's misappropriation, if he is left unrestrained.

## COUNT VII
### Civil Conspiracy Against FCS, Finn, and Molloy

201. AmaTech incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

202. On information and belief, FCS', Mr. Finn's, and Mr. Molloy's actions have been in furtherance of an unlawful civil conspiracy to misappropriate AmaTech confidential trade secret information.

44

203.     On information and belief, FCS and Mr. Finn knowingly acted to induce Mr. Molloy to provide them with AmaTech's trade secret information, either before or shortly after Mr. Molloy's suspension and resignation from AmaTech in February 2020.  FCS and Mr. Finn knew that Mr. Molloy was not authorized to share AmaTech's confidential information with them and that, by doing so, he would be violating his confidentiality obligations to AmaTech. Mr. Molloy knew that FCS and Mr. Finn intended to misappropriate AmaTech's trade secrets for their own benefit and that his unauthorized sharing of AmaTech's confidential information with them would be in furtherance of that plan.

204.     On information and belief, FCS, Mr. Finn, and Mr. Molloy agreed on and acted in concert to execute this unlawful scheme to misappropriate and misuse AmaTech's confidential trade secrets.

205.     The AmaTech trade secrets misappropriated as a result of this scheme include confidential information relating to (i) AmaTech's epoxy-based adhesive system comprising a 25 µm PEN film coated on both sides with a 25 µm coating of an epoxy based thermosetting adhesive; (ii) AmaTech's coupling antenna design; and/or (iii) AmaTech's dual-interface 6-pin module design.

206.     FCS', Mr. Finn's, and Mr. Molloy's conspiracy to misappropriate AmaTech's trade secrets has caused harm to AmaTech, including by diminishing the commercial value of those trade secrets.

207.     FCS, Mr. Finn, and Mr. Molloy, as joint tortfeasors, are jointly and severally liable for the misappropriation of AmaTech's trade secrets.

## <u>COUNT VIII</u>
### Breach of Contract Against Linden

208.    AmaTech incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

209.    Mr. Linden's August 12, 2019 engagement letter with AmaTech is an enforceable contract for legal services, in which Mr. Linden expressly represented that he had no conflicts of interests with other clients of his.

210.    At all times, AmaTech was in strict compliance with and fully performing its obligations under the contract with Mr. Linden.

211.    In breach of the contract, however, from at least August 12 to the present, Mr. Linden has represented and rendered legal services to Defendants FCS and Mr. Finn by preparing, filing, and prosecuting patent applications on their behalf, in conflict with his duties to AmaTech and all to the detriment of, and substantial damage to, AmaTech.

212.    Mr. Linden's representation of Mr. Finn and/or FCS has conflicted with his duties to AmaTech, has been directly adverse to AmaTech, and/or has materially limited his representation of AmaTech.

213.    Mr. Linden's conflicting representation of FCS and Mr. Finn has included preparing and filing one or more patent applications on their behalf containing information that Mr. Linden knew or should have known constituted AmaTech's confidential trade secret information and his failing to advise AmaTech of this misappropriation.  Further, Mr. Linden's conflicting representation of FCS and Mr. Finn has included preparing and filing one or more patent applications on their behalf disparaging AmaTech's patent applications, which Mr. Linden previously prepared, filed, and prosecuted on AmaTech's behalf in the course of his representation of AmaTech.  Further, Mr. Linden's conflicting representation of FCS and Mr.

46

Finn has included filing one or more patent applications on their behalf with claims directed to the same subject matter, or obvious variations thereof, as that taught in AmaTech's prior patent applications, which Mr. Linden also previously prepared, filed, and prosecuted on AmaTech's behalf in the course of his representation of AmaTech.

214.    Mr. Linden never disclosed this conflict of interest to AmaTech.

215.    Through these acts, Mr. Linden has breached his contract with AmaTech and proximately caused damage to AmaTech. This includes damage caused by the delay in uncovering FCS', Mr. Finn's, and Mr. Molloy's misappropriation of AmaTech's trade secrets. Had Mr. Linden promptly notified AmaTech that AmaTech's confidential information was appearing in FCS' and Mr. Finn's patent applications, this delay would have been avoided, and those applications could have been withdrawn so as to prevent their publication and the disclosure of AmaTech's trade secrets to the public. Further, the damage sustained by AmaTech as a result of Mr. Linden's breaching conduct includes damage caused by the disparaging statements he made in FCS' and/or Mr. Finn's patent applications in relation to AmaTech's patent applications and inventions. Mr. Linden made those disparaging statements in order to advance FCS' and/or Mr. Finn's interests, and specifically to avoid AmaTech's prior publications being cited as prior art against FCS' and/or Mr. Finn's applications and allow FCS and Mr. Finn to secure patent coverage for the same, or substantially the same, subject matter. Further, the damage sustained by AmaTech as a result of Mr. Linden's breaching conduct includes forcing AmaTech to incur significant expenses and costs in bringing and prosecuting this action and conducting an extensive investigation to uncover Mr. Linden's wrongdoing.

216.    AmaTech is entitled to damages sufficient to compensate for Mr. Linden's breach.  AmaTech is further entitled to the disgorgement of all fees it paid to Mr. Linden for his services during the period of his conflicting representation.

## COUNT IX
## Breach of Fiduciary Duty Against Linden

217.    AmaTech incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

218.    Both before and after August 12, 2019, Mr. Linden performed extensive legal work for AmaTech, which included preparing, filing, and prosecuting patent applications before the USPTO on AmaTech's behalf.  Therefore, there existed an attorney-client relationship between him and AmaTech.

219.    As an attorney for AmaTech, Mr. Linden owed AmaTech the fiduciary duties of loyalty, complete candor and honesty, and conflict-free representation.

220.    Those fiduciary duties required Mr. Linden to (i) place the interests of AmaTech, his client, first; (ii) act with utmost fairness toward his client; (iii) preserve the confidences of his client; (iv) make full disclosure of all material facts and matters within the scope or and bearing on his representation of AmaTech; and (v) avoid the representation interests that conflict with those of AmaTech to which AmaTech had not given informed consent.

221.    Contrary to those duties, however, from at least August 12 to the present, Mr. Linden has represented and rendered legal services to Defendants FCS and Mr. Finn by preparing, filing, and prosecuting patent applications on their behalf, in conflict with his duties to AmaTech and all to the detriment of, and substantial damage to, AmaTech.

222. Mr. Linden's representation of Mr. Finn and/or FCS has conflicted with his duties to AmaTech, has been directly adverse to AmaTech, and/or has materially limited his representation of AmaTech.

223. Mr. Linden's conflicting representation of FCS and Mr. Finn has included preparing and filing one or more patent applications on their behalf containing information that Mr. Linden knew or should have known constituted AmaTech's confidential trade secret information and his failing to advise AmaTech of this misappropriation. Further, Mr. Linden's conflicting representation of FCS and Mr. Finn has included preparing and filing one or more patent applications on their behalf disparaging AmaTech's patent applications, which Mr. Linden previously prepared, filed, and prosecuted on AmaTech's behalf in the course of his representation of AmaTech. Further, Mr. Linden's conflicting representation of FCS and Mr. Finn has included filing one or more patent applications on their behalf with claims directed to the same subject matter, or obvious variations thereof, as that taught in AmaTech's prior patent applications, which Mr. Linden also previously prepared, filed, and prosecuted on AmaTech's behalf in the course of his representation of AmaTech.

224. Mr. Linden intentionally and willfully, or by reckless indifference, concealed this conflict of interest from AmaTech.

225. Mr. Linden's breach of his fiduciary duties of loyalty, candor, and conflict-free representation has proximately caused damage to AmaTech. This includes damage caused by the delay in uncovering FCS', Mr. Finn's, and Mr. Molloy's misappropriation of AmaTech's trade secrets. Had Mr. Linden promptly notified AmaTech that AmaTech's confidential information was appearing in FCS' and Mr. Finn's patent applications, this delay would have been avoided, and those applications could have been withdrawn so as to prevent their

publication and the disclosure of AmaTech's trade secrets to the public. Further, the damage sustained by AmaTech as a result of Mr. Linden's breaching conduct includes damage caused by the disparaging statements he made in FCS' and/or Mr. Finn's patent applications in relation to AmaTech's patent applications and inventions. Mr. Linden made those disparaging statements in order to advance FCS' and/or Mr. Finn's interests, and specifically to avoid AmaTech's prior publications being cited as prior art against FCS' and/or Mr. Finn's applications and allow FCS and Mr. Finn to secure patent coverage for the same, or substantially the same, subject matter. Further, the damage sustained by AmaTech as a result of Mr. Linden's breaching conduct includes forcing AmaTech to incur significant expenses and costs in bringing and prosecuting this action and conducting an extensive investigation to uncover Mr. Linden's wrongdoing.

226. AmaTech is entitled to damages sufficient to compensate for Mr. Linden's breach. AmaTech is further entitled to the disgorgement of all fees it paid to Mr. Linden for his services during the period of his conflicting representation.

## COUNT X
### Fraud Against Linden

227. AmaTech incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

228. This claim for relief is brought in the alternative to the breach of contract and breach of fiduciary duty claims stated in Counts Eight and Nine above.

229. Mr. Linden has performed extensive legal work for AmaTech over many years.

230. In his dealings with AmaTech, Mr. Linden represented himself to be a duly licensed attorney at all times.

50

231. On information and belief, Mr. Linden was not, in fact, licensed to practice law in any jurisdiction in the U.S. during at least some of the time when he purported to act as AmaTech's attorney.

232. On information and belief, Mr. Linden purposefully and willfully represented himself to be a duly licensed attorney in his dealings with AmaTech despite knowing that such representations were false.

233. Mr. Linden knowingly and willfully concealed the fact that he had ceased to be a duly licensed attorney from AmaTech.

234. On information and belief, Mr. Linden misrepresented and concealed the true status of his attorney license with the specific intent to mislead AmaTech and cause AmaTech to contract for his professional services.

235. Mr. Linden's misrepresentations and omissions were material to AmaTech's decision to hire Mr. Linden as its patent attorney and continue that engagement. Had AmaTech known that Mr. Linden ceased to be a duly licensed attorney, it would not have hired Mr. Linden and/or would have terminated his services upon learning that fact.

236. As a direct and proximate result of Mr. Linden's fraudulent actions, AmaTech has suffered significant damages, in an amount to be proven at trial.

237. AmaTech is entitled to damages sufficient to compensate for Mr. Linden's fraud. AmaTech is further entitled to the disgorgement of all fees it paid to Mr. Linden for his services during the time when he was not a duly licensed attorney.

238. Mr. Linden's fraudulent actions were intentional and malicious, entitling AmaTech to an award of punitive damages.

## COUNT XI
### Tortious Interference With Contract Against FCS (Molloy Contract)

239.    AmaTech incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

240.    AmaTech had a valid and existing employment contract with Mr. Molloy.  *See* Ex. 1.  This contract contained a "Confidentiality" provision that prevented Mr. Molloy from divulging any AmaTech confidential information to anyone outside AmaTech.

241.    On information and belief, FCS was aware of Mr. Molloy's employment contract with AmaTech and the confidentiality restrictions therein.

242.    FCS, without privilege, justification, or cause, intentionally and unfairly interfered with AmaTech's contract with Mr. Molloy, including by inducing Mr. Molloy to disclose AmaTech's confidential information to FCS in breach of his confidentiality obligations to AmaTech.

243.    AmaTech has been damaged as a direct and proximate result of FCS' tortious interference with AmaTech's contract with Mr. Molloy.  The damage sustained by AmaTech includes the loss of valuable trade secret information to FCS (a competitor) and the public disclosure of this heretofore confidential information in FCS' and/or Mr. Finn's patent filings.

244.    The actions of FCS in interfering with the contract were intentional and malicious, entitling AmaTech to an award of punitive damages.

## COUNT XII
### Tortious Interference With Contract Against FCS (Linden Contract)

245.    AmaTech incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

246. AmaTech also had a valid and existing contract with Mr. Linden for provision of legal services. *See* Ex. 2. This contract obligated Mr. Linden to represent AmaTech free of any conflicts of interest.

247. On information and belief, FCS was aware of Mr. Linden's contract with AmaTech and his obligations thereunder.

248. FCS, without privilege, justification, or cause, intentionally and unfairly interfered with AmaTech's contract with Mr. Linden, including by engaging Mr. Linden to prepare, file, and prosecute patent applications on FCS' and/or Mr. Finn's behalf that FCS knew would create a conflict of interest for Mr. Linden with respect to his duties to AmaTech.

249. AmaTech has been damaged as a direct and proximate result of FCS' tortious interference with AmaTech's contract with Mr. Linden. This includes damage caused by the delay in uncovering FCS', Mr. Finn's, and Mr. Molloy's misappropriation of AmaTech's trade secrets. Had Mr. Linden promptly notified AmaTech that AmaTech's confidential information was appearing in FCS' and Mr. Finn's patent applications, this delay would have been avoided, and those applications could have been withdrawn so as to prevent their publication and the disclosure of AmaTech's trade secrets to the public. Further, the damage sustained by AmaTech as a result of FCS' tortious interference includes damage caused by the disparaging statements that Mr. Linden made in FCS' and/or Mr. Finn's patent applications in relation to AmaTech's patent applications and inventions. Mr. Linden made those disparaging statements on FCS' and/or Mr. Finn's behalf and in order to advance their interests, and specifically to avoid AmaTech's prior publications being cited as prior art against FCS' and/or Mr. Finn's applications and allow FCS and Mr. Finn to secure patent coverage for the same, or substantially the same, subject matter. Further, the damage sustained by AmaTech as a result of FCS' tortious

interference includes forcing AmaTech to incur significant expenses and costs in bringing and prosecuting a claim against Mr. Linden for breach of contract and conducting an extensive investigation to uncover that breach.

## COUNT XIII
### Tortious Interference With Contract Against Finn (Molloy Contract)

250. AmaTech incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

251. AmaTech had a valid and existing employment contract with Mr. Molloy. *See* Ex. 1. This contract contained a "Confidentiality" provision that prevented Mr. Molloy from divulging any AmaTech confidential information to anyone outside AmaTech.

252. On information and belief, Mr. Finn was aware of Mr. Molloy's employment contract with AmaTech and the confidentiality restrictions therein.

253. Mr. Finn, without privilege, justification, or cause, intentionally and unfairly interfered with AmaTech's contract with Mr. Molloy, including by inducing Mr. Molloy to disclose AmaTech's confidential information to Mr. Finn in breach of his confidentiality obligations to AmaTech.

254. AmaTech has been damaged as a direct and proximate result of Mr. Finn's tortious interference with AmaTech's contract with Mr. Molloy. The damage sustained by AmaTech includes the loss of valuable trade secret information to FCS (a competitor) and the public disclosure of this heretofore confidential information in Mr. Finn's and/or FCS' patent filings.

255. The actions of Mr. Finn in interfering with the contract were intentional and malicious, entitling AmaTech to an award of punitive damages.

## COUNT XIV
### Tortious Interference With Contract Against Finn (Linden Contract)

256. AmaTech incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

257. AmaTech also had a valid and existing contract with Mr. Linden for provision of legal services. *See* Ex. 2. This contract obligated Mr. Linden to represent AmaTech free of any conflicts of interest.

258. On information and belief, Mr. Finn was aware of Mr. Linden's contract with AmaTech and his obligations thereunder.

259. Mr. Finn, without privilege, justification, or cause, intentionally and unfairly interfered with AmaTech's contract with Mr. Linden, including by engaging Mr. Linden to prepare, file, and prosecute patent applications on Mr. Finn's and/or FCS' behalf that FCS knew would create a conflict of interest for Mr. Linden with respect to his duties to AmaTech.

260. AmaTech has been damaged as a direct and proximate result of Mr. Finn's tortious interference with AmaTech's contract with Mr. Linden. This includes damage caused by the delay in uncovering FCS', Mr. Finn's, and Mr. Molloy's misappropriation of AmaTech's trade secrets. Had Mr. Linden promptly notified AmaTech that AmaTech's confidential information was appearing in FCS' and Mr. Finn's patent applications, this delay would have been avoided, and those applications could have been withdrawn so as to prevent their publication and the disclosure of AmaTech's trade secrets to the public. Further, the damage sustained by AmaTech as a result of Mr. Finn's tortious interference includes damage caused by the disparaging statements that Mr. Linden made in FCS' and/or Mr. Finn's patent applications in relation to AmaTech's patent applications and inventions. Mr. Linden made those disparaging statements on FCS' and/or Mr. Finn's behalf and in order to advance their interests, and

specifically to avoid AmaTech's prior publications being cited as prior art against FCS' and/or

Mr. Finn's applications and allow FCS and Mr. Finn to secure patent coverage for the same, or

substantially the same, subject matter. Further, the damage sustained by AmaTech as a result of

Mr. Finn's tortious interference includes forcing AmaTech to incur significant expenses and

costs in bringing and prosecuting a claim against Mr. Linden for breach of contract and

conducting an extensive investigation to uncover that breach.

## REQUEST FOR RELIEF

WHEREFORE, AmaTech respectfully requests:

1. Enter judgment in favor of AmaTech and against FCS, Finn, Molloy, and Linden on all counts in this Complaint.

2. Award injunctive relief, including preliminary and permanent injunctive relief, directing FCS and Finn to assign any patents and patent applications that contain or are based on AmaTech's misappropriated trade secrets to AmaTech.

3. Award injunctive relief, including preliminary and permanent injunctive relief, directing FCS and Finn to correct records at the USPTO reflecting the assignment of any patents and patent applications that contain or are based on AmaTech's misappropriated trade secrets to AmaTech.

4. Award injunctive relief, including preliminary and permanent injunctive relief, restraining FCS and Finn from filing any further patent applications with the USPTO or any other patent office incorporating AmaTech's misappropriated trade secrets.

5. Award injunctive relief, including preliminary and permanent injunctive relief, restraining FCS, Finn, and Molloy from disclosing and/or using AmaTech's misappropriated trade secrets in any product, method, service, or process.

6.      Award injunctive relief, including preliminary and permanent injunctive relief, restraining FCS and Finn from further interfering with AmaTech's contracts with Molloy and Linden.

7.      Award injunctive relief, including preliminary and permanent injunctive relief, restraining Linden from further representing FCS and/or Finn in conflict with his duties to AmaTech.

8.      Award AmaTech damages for the actual loss, unjust enrichment, and/or a reasonable royalty due to the misappropriation, and any and all other damages that may be awarded.

9.      Award AmaTech exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C) and OCR § 1333.63(B).

10.      Award AmaTech damages for FCS' and Finn's tortious interference with contract, such damages to include actual loss, unjust enrichment, and punitive damages.

11.      Award AmaTech damages for Linden's breach of contract, breach of fiduciary duty, and fraud, such damages to include actual loss, unjust enrichment, and punitive damages.

12.      Award AmaTech attorneys' fees and costs.

13.      Award AmaTech pre-judgment and post-judgment interest.

14.      Award AmaTech any such other relief as the Court deems appropriate.

## JURY DEMAND

AmaTech demands a trial by jury on all issues so triable.

Dated: June 14, 2021                            Respectfully submitted,

*/s/ Karen K. Gaunt*
Karen K. Gaunt (0068418), Trial Attorney
Oleg Khariton (0091260)
DINSMORE & SHOHL LLP
255 Fifth Street, Suite 1900
Cincinnati, OH 45202
Telephone:  (513) 977-8200
Facsimile:  (513) 977-8141
karen.gaunt@dinsmore.com
oleg.khariton@dinsmore.com

*Attorneys for Plaintiff AmaTech Group
Limited*